589 So.2d 901 (1991)
THE FLORIDA BAR, Complainant,
v.
Harvey S. SWICKLE, Respondent.
No. 75348.
Supreme Court of Florida.
November 14, 1991.
*902 John F. Harkness, Jr., Executive Director and John T. Berry, Staff Counsel, Tallahassee, and Warren Jay Stamm, Bar Counsel, Miami, for complainant.
Nicholas R. Friedman, Friedman, Baur, Miller & Webner, P.A., Miami, for respondent.
PER CURIAM.
This case is before us upon the complaint of The Florida Bar and the report and recommendation of the referee. We have jurisdiction under article V, section 15, Florida Constitution.
The Bar filed a complaint against Respondent Swickle alleging several ethical violations. The alleged violations arose from an investigation by the State Attorney's Office and the Florida Department of Law Enforcement into a suspected bribery and conspiracy involving Swickle and former Circuit Judge Howard Gross. After an evidentiary hearing on the Bar's complaint, the referee made the following findings of fact:
1. On October 7, 1981, undercover agent Eugene Caso (FDLE), a/k/a Ernesto Cassal (hereinafter referred to as Cassal), arranged to have respondent Harvey S. Swickle contact him in reference to a criminal matter requiring legal representation. Cassal intended to convey the image that he was an illegitimate South American businessman such as a money launderer or someone who takes care of businesses for questionable Latin American businessmen.
2. That same day at 5:55 P.M., Cassal telephoned respondent and provided respondent with sketchy information concerning the arrest of Orlando Zirio. Orlando Zirio is the name used by an FDLE agent who was fictitiously arrested and booked into the Dade County Jail on charges of trafficking cocaine, conspiracy to traffic in cocaine, and possession of cocaine. During this conversation, Cassal indicated that Zirio had been arrested with about a dozen kilos of cocaine and he wanted Zirio released as soon as possible.
3. During a subsequent conversation with respondent, Cassal informed respondent that Zirio's bond had been set at $750,000 and he needed it brought down to about $150,000. After indicating he could not obtain such a bond reduction that night, respondent stated he might be able to do so depending on whether Zirio had ties to the community. At that time, Cassal had only indicated that Zirio was a Marielito. Respondent had indicated in an earlier conversation that he might be able to lower the bond depending on who was the emergency judge.
4. Respondent then called the home of Dade County Circuit Judge Howard Gross and was on the telephone for one minute and 59 seconds.
5. At 9:11 P.M., Cassal called respondent at home and told him that Zirio is roughly 28 years old, has been in the United States three years, is unmarried, has children but they may be in Cuba, has no family here, and is renting his residence. In response to a question as to Zirio's work status, Cassal indicated "Ah, no, no, he uh, no, he just does work for ah, you know, for my ah ..." Respondent's handwritten notes reflect this information and specifically indicate that *903 Zirio is not working. Cassal reiterated the importance of getting Zirio released soon and that Cassal could get hold of any money that was needed. Respondent stated, "OK, I'm waiting to hear back now, ah, just stay where you are and I'll call you as soon as I hear from my, my guy." I find that this statement was intended to convey and did convey to Cassal that respondent was able to influence a judge to lower Zirio's bond. This finding is premised on a careful review of the entire transcript of the conversations between Cassal and respondent, paying particular attention to the messages conveyed beyond the literal meaning of the words used. In analyzing these conversations, I was aware of the testimony of Manny Barcenas who stated that he had paid respondent $15,000 to bribe a judge to lower Artemio Carrandi's bond. I also considered the testimony of Special Agent Supervisor John Coffey who testified that, after arrest, respondent told him he paid Judge Gross $5,000 for assisting in lowering Carrandi's bond.
6. At about 9:20 P.M., Judge Gross called the Dade County Jail indicating he wanted to reduce a $750,000 bond.
7. At 9:25 P.M., respondent called Cassal and stated he could reduce the bond tonight if respondent files an appearance on Zirio's behalf and represents Zirio. Respondent goes on to say, "I need a $20,000 retainer, the bond will be reduced to 200,000 dollars."
8. Cassal subsequently calls respondent and says "OK, I've got the twenty." Respondent immediately calls Judge Gross' home and is on the line for one minute and nine seconds.
9. At about 10:30 P.M., respondent meets Cassal in the lobby of Cassal's hotel. During a discussion with Cassal, Cassal indicates he only has $10,000 but should be receiving the other $10,000 within a couple of hours. Respondent calls Judge Gross from the hotel lobby while Cassal is counting the money. Respondent tells Judge Gross he has a signed contract. Judge Gross says, "OK, if you are his lawyer and you tell me those are the facts, I'll reduce the bond accordingly." Respondent then arranges to meet Judge Gross at the Judge's house at about eight the next morning. Respondent then goes back to Cassal and gets $10,000. Respondent says that if there are any problems the money goes back and as soon as we get back together again we are all finished.
10. At about 11:00 P.M., Judge Gross lowered Zirio's bond to $200,000. Judge Gross' handwritten notes indicate that Zirio was arrested with three to four kilos. Judge Gross testified that respondent told him that Zirio was a key employee, had children, resided here, and had no prior problems with the law.
11. At 12:05 A.M. on October 8, 1987, respondent meets Cassal at the hotel and picks up an additional $5,000.
12. At about 6:30 A.M. on October 8, 1987, respondent meets Cassal at the hotel again to pick up the remaining $5,000 for a total of $20,000. Cassal lets respondent know that Zirio will "vaporize." Respondent indicates that he will file an appearance anyway to follow the bases and make sure there are no problems. At no time did respondent attempt to advise Judge Gross or anyone else of Zirio's probable disappearance.
13. Respondent met Judge Gross at the Judge's residence at 8:00 A.M. and gave him $6,300 of the cash respondent received from Cassal. Soon thereafter, respondent was arrested and $13,200 of the money received from Cassal was found in respondent's car. Respondent had given the remaining $500 to his wife. Judge Gross testified that the money he received was for repayment of a loan.
(Record citations and footnote omitted.)
Swickle was tried and acquitted on criminal charges arising from this incident.
The referee recommended that Swickle be found guilty of violating the following Rules Regulating The Florida Bar: rule 4-3.3(d) (in an ex parte proceeding a lawyer shall inform the tribunal of all material facts known to the lawyer which will enable the tribunal to make an informed decision, whether or not the facts are adverse); *904 rule 4-4.1(a) (in the course of representing a client, a lawyer shall not knowingly make a false statement of material fact or law to a third person); rule 4-8.4(e) (a lawyer shall not state or imply an ability to influence improperly a government agency or official); and rule 4-8.4(a), (c), (d) (a lawyer shall not violate the Rules of Professional Conduct; engage in conduct involving dishonesty, fraud, deceit, or misrepresentation; or engage in conduct that is prejudicial to the administration of justice).[1] The referee further recommended that Swickle be disbarred.
Swickle alleges that due process errors occurred in the grievance committee proceedings. First, he argues that the notice of the grievance committee hearing was untimely and that the charges against him were vague. Swickle misperceives the nature of proceedings before the grievance committee. Grievance committee proceedings are principally investigatory. They are comparable to proceedings before a grand jury. They are nonadversarial. There is no right of confrontation or cross-examination. The attorney under investigation is not entitled to a bill of particulars because the committee itself is without particulars until it completes its investigation. The Fla. Bar v. Wagner, 175 So.2d 33, 35 (Fla. 1965).
The respondent has only limited rights in this context. At a reasonable time before a finding of probable cause is made, the respondent shall be advised of the conduct under investigation and the rules that may have been violated. In addition, the respondent must be given all materials considered by the committee, as well as an opportunity to make a written statement explaining, refuting, or admitting the alleged misconduct. R.Reg.Fla.Bar. 3-7.4(g).
The notice to Swickle was fair and in full compliance with the applicable rule. Swickle received notice on May 26, 1989 of the hearing scheduled for June 8, 1989. The notice identified the rules allegedly violated. Swickle was aware of the conduct under investigation. Further, Swickle was represented by counsel at the grievance committee hearing and was given an opportunity to cross-examine Bar witnesses.
Swickle claims that Florida Department of Law Enforcement Agent Flint and others involved in the unsuccessful criminal litigation improperly prosecuted the Bar's case against him. He relies on State ex rel. The Florida Bar v. Murrell, 74 So.2d 221 (Fla. 1954). In Murrell, insurance companies initiated and carried out an investigation of the professional conduct of an attorney who represented clients in negligence and compensation cases. This Court condemned the practice of allowing those with interests adverse to an attorney a prominent part in directing disciplinary proceedings against the attorney. Rather, investigations in disciplinary matters should be conducted by the Bar.
There is no suggestion here, as there was in Murrell, that improper motive prompted the investigation into the respondent's professional conduct. This disciplinary matter arose out of a criminal investigation into suspected illegal conduct. Moreover, Agent Flint did not prosecute the Bar's case against Swickle. He merely testified as a witness. Nothing prohibits the Bar from proving its case by using the same witnesses who testified in the criminal trial. The determination of Flint's credibility was within the province of the grievance committee and the referee.
Swickle also complains of the Bar's action in moving, without notice to him, to stay proceedings before the referee in the Bar's case against Gross. The motion to stay indicated that Gross and the Bar had negotiated a conditional guilty plea and consent judgment. The plea was to be withheld until after the conclusion of proceedings against Swickle. Swickle claims error in the Bar's refusal to provide him with the details of Gross's plea agreement.
*905 The cases against Gross and Swickle were separate disciplinary matters arising out of the same set of facts. The Bar was not required to give Swickle notice of the proceedings in the independent case against Gross. Nor was the Bar prohibited from entering into negotiations with Gross and postponing that case until resolution of Swickle's case. Swickle has not shown what relevance the Bar's plea agreement with Gross had in his case. Had the Bar called Gross as a witness at Swickle's evidentiary hearing, the plea agreement might have been relevant for impeachment purposes. However, Gross only testified in Swickle's behalf. There is no suggestion that Swickle would have wanted to use the plea agreement to impeach his own witness, even if he could properly do so. Swickle appears to claim that had the referee been aware of the discipline recommended by the Bar as part of the plea agreement with Gross, he would have recommended a lesser discipline in this case. The Bar's recommended discipline in the Gross case has no bearing on the appropriate discipline here. The cases involve different alleged rules violations, a different amount of proof, and different factors in mitigation and aggravation. Further, the ultimate determination of the appropriate discipline is the sole province of this Court.
Swickle argues that his acquittal of criminal charges should preclude disciplinary action against him. Under the Rules Regulating The Florida Bar, the acquittal of an attorney in a criminal proceeding does not necessarily bar disciplinary proceedings. R.Reg.Fla.Bar. 3-4.4. Further, whether Swickle engaged in criminal misconduct is not at issue here. We are concerned with violations of ethical responsibilities imposed on Swickle as a member of the Bar of this state.
We reject Swickle's contention that disbarment is not warranted on the facts of this case. The referee found that Swickle misrepresented material facts to a judge and failed to disclose other material facts. In addition, the referee found that Swickle led Cassal to believe that he could bribe a judge to reduce Zirio's bond. The nature of Swickle's misconduct warrants disbarment. In particular, suggesting that one has the ability to bribe a judge strikes at the core of our legal system. Our system is designed to insure that equal justice prevails for all, whether rich or poor, powerful or powerless. The Fla. Bar v. McCain, 361 So.2d 700, 707 (Fla. 1978). When people are led to believe that justice is dispensed on the basis of corrupt influences, the public cannot have confidence in the integrity or impartiality of the judiciary or the bar. The entire judicial process is undermined as a result. Id.
Accordingly, we adopt the referee's factual findings and accept the recommended discipline. Respondent Harvey Swickle is hereby disbarred effective December 16, 1991, thereby giving respondent thirty days to close out his practice. Respondent shall accept no new business after the date of this opinion. Judgment for costs in the amount of $3,497.55 is hereby entered against the respondent, for which sum let execution issue.
It is so ordered.
SHAW, C.J., and OVERTON, BARKETT, GRIMES and HARDING, JJ., concur.
McDONALD and KOGAN, JJ., recused.
NOTES
[1] The referee found that there was not clear and convincing evidence to support a finding that Swickle bribed or attempted to bribe Judge Gross to lower Zirio's bond.